C. Hugh BLAIR, Plaintiff,

v.

J. R. ANDREWS, Inc. OF DELAWARE, a corporation, Defendant.

Civ. A. 13393.

United States District Court
W. D. Pennsylvania.

May 10, 1956.

John Laubach, Jr., Pittsburgh, Pa., for plaintiff.

Cyril T. Garvey, Wiesen, Cusick & Madden, Sharon, Pa., for defendant.

MARSH, District Judge.

This is a diversity action brought on a 90-day promissory note executed and delivered by defendant company to plaintiff in the sum of $9,000. A non-jury trial was held.

Plaintiff, C. Hugh Blair, a citizen of the State of Pennsylvania, is an insurance agent specializing in pension plans, with offices in Pittsburgh, Pennsylvania.

Defendant, J. R. Andrews, Inc. of Delaware, is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business in Adamsville, Crawford County, Pennsylvania.

Company officers were P. H. Muntz, president and treasurer; T. C. Miller, vice-president, of Aberdeen, Maryland; Cyril T. Garvey, secretary, of Sharon, Pennsylvania, a lawyer; and R. H. Comstock, assistant secretary and assistant treasurer; of these only Muntz and Comstock were active in the affairs of the company and Muntz conducted its business.

All of defendant's stock was owned by Farm Industrial Supplies, Incorporated, and Muntz and Miller, together with their wives, owned all the stock of the latter.

The matter in controversy exceeds, exclusive of interest and costs, the sum of $3,000.

During the summer and fall of 1954, plaintiff had been persistently attempting to sell to defendant a pension plan. He had submitted several proposals to Muntz, a cousin, and had discussed one of them in August with Garvey. About this time Muntz had discussed a plan submitted by plaintiff with Mortensen.

Plaintiff had exhibited to Muntz and Comstock examples of trust agreements setting out terms of the pension plans he was urging defendant to adopt. On or prior to September 9th, Muntz decided to institute one of plaintiff's pension plans for the benefit of certain employees of his company. On September 9th in plaintiff's presence, he told several employees that the company was inaugurating a pension plan, and six employees, including Muntz, signed applications for retirement insurance. Muntz executed these six applications as trustee and owner in accordance with the scheme of the plan. About this time the proposed date of the plan was changed to July 15, 1954 and the proposed benefits were reduced from 50% to 25% of salaries. A few days prior to October 27, 1954 Muntz advised plaintiff over the telephone that the company was ready to formally inaugurate the pension plan which he had approved in September.

On October 27th, plaintiff drove to the company office at Adamsville where he presented Muntz and Comstock with a ribbon copy of a trust agreement, a resolution of the directors authorizing the trust agreement, and five carbon copies of each. The trust agreement set forth the terms and provisions of the pension plan which had been agreed upon, and recited that it was "Made this 15th day of July, 1954, between J. R. Andrews (Inc.), a Delaware corporation * * * and P. Henry Muntz as Trustee * * *, and effective as of July 15, 1954." The plan provided, inter alia, that retirement income policies were to be issued by an insurance company and were to be delivered to and owned by the trustee.

The resolution recited, inter alia, that a directors' meeting had been held on July 15, 1954 and purported to authorize

P. Henry Muntz, the president, to execute and deliver on behalf of the company the agreement of trust between it and P. Henry Muntz as trustee and affix the corporate seal thereto; it appointed Comstock as manager of the pension plan; it also authorized the Treasurer (Muntz) to pay the first year's premiums.

Each of these documents was certified by Comstock as "a true and correct copy" and on each he impressed the corporate seal.

One certified copy of the trust agreement was signed twice by Muntz, first as president and second as trustee.

With Muntz's consent, plaintiff took all these documents with him when he departed ostensibly for Sharon and Pittsburgh.

On a certified copy of the resolution, plaintiff wrote the name Cyril T. Garvey on the line designated for the secretary's signature. On the certified copy of the trust agreement executed by Muntz as president and trustee, he wrote Garvey's name on the line designated for the secretary's signature in attestation thereof. He then forwarded these two documents (Exhibits 19 and 20) to the Phoenix Mutual Life Insurance Company along with the applications. In due course the insurance company issued retirement policies to the trustee for seven employees of the defendant.[1] On November 19, 1954 plaintiff delivered these policies to Muntz as trustee as provided in the agreement.

If relevant or material to a decision, I would find that Muntz and Comstock had not seen an exact duplicate of the trust agreement or of the resolution prior to the time plaintiff presented them for certification on October 27th.[2]

The premiums amounted to $11,636.28. These were partially paid by three checks executed in the name of the defendant by Muntz and Comstock, its president and assistant treasurer, viz.: (1) on October 27, 1954, $1,500; (2) on November 19, 1954 in the sum of $443.16; (3) on December 31, 1954 in the sum of $693.12.

On the last mentioned date, the defendant, by its president and assistant treasurer, executed and delivered to the plaintiff the note in suit for $9,000, the balance due on the premiums. The plaintiff paid the premiums due to the insurance company.

Both Muntz and Comstock knew that the directors did not meet on July 15, 1954[3] and had not at any subsequent time authorized the trust agreement. However, Muntz actually had prior authority from the directors to commit the company to one of two pension plans, but he erroneously believed that he could select one of plaintiff's propositions.[4]

Muntz and Comstock did not direct plaintiff to secure the signature of sec-

1. A seventh employee applied under date of October 9, 1954.

2. Although plaintiff assumed that he gave the "original documents" to Muntz "about the middle of July" (Testimony, p. 13) and testified that Muntz advised him prior to October 27th that these had been executed, plaintiff failed to sustain the burden of proof on this point. Both Muntz and Comstock denied ever seeing any draft prior to October 27th. Their testimony is corroborated in that the ribbon copies of the trust agreement and resolution (Exhibit C) were among those certified on October 27th; plaintiff admits changes were made in the plan following discussions in August and September,

e. g., the proposed pension was reduced from 50% to 25% of basic salaries (Testimony, pp. 14–15); and when asked, "Did you then give him, after the decision to change from 50% to 25% of basic salary, did you rewrite a proposed trust agreement for him?" he failed to answer responsively. Exhibit D is not a carbon copy of Exhibit C. Compare Testimony, pp. 7, 13, 27, 37.

3. The last directors' meeting prior to July, 1954 was held on June 15, 1954, and the next directors' meeting was held on May 15, 1955.

4. Testimony, pp. 102–103; Pre-trial pp. 10–11; cf. Maslo Mfg. Co. v. Proctor Electric Co., 376 Pa. 553, 103 A.2d 743.

retary Garvey on the executed certified copy of the trust agreement or on the certified copy of the resolution, nor in the three months which followed were they even slightly concerned whether he had done so. Neither did plaintiff represent to them that he would secure Garvey's signatures to these instruments, although they may have understood that he would do so.

No fraud on the part of plaintiff in procuring the signatures of Muntz on the certified copy of the trust agreement or the signatures of Comstock in certification of all the documents was alleged or proved.

In the latter part of November a written announcement, prepared by plaintiff and signed by the president, was distributed among all defendant's employees, informing them that the company had instituted the pension plan.

Director Miller, who apparently had been informed by plaintiff prior to December 9, 1954 that the plan was in effect, does not appear to have made any protest. Monthly financial statements prepared by Comstock and mailed to the directors for October, November and December, 1954 reflect the premiums paid for the pension plan. It was not until February 14, 1955, when the company's losses came to the attention of director Mortensen that he "suddenly tumbled to the fact that they had bought a pension plan of which I knew nothing and had not been authorized, and I proceeded to raise Cain."

After an executive committee meeting on February 26, 1955, the company sought to cancel the policies with the life insurance company. Payment of plaintiff's note was refused.

The employees who were covered by the policies issued were told that the plan had been rejected, and on June 21, 1955 those whose policies included term life insurance received refunds from the defendant for the premiums that they had paid.[5]

As of July 15, 1955 the insurance company returned the cash surrender value of the policies in the sum of $7,664.02, which amount was computed on the assumption that the policies had been in force for one year.[6] The policies were returned to the insurance company on August 4, 1955 and were stamped surrendered under date of August 9, 1955.

██ The plaintiff was entitled to presume that the note in suit was properly executed on behalf of defendant by its president and assistant treasurer unless he had actual knowledge to the contrary.[7]

██ The defense stressed is that plaintiff was bound to know that the president had no actual authority to bind the defendant company to the pension plan, and therefore plaintiff could not assume that the note given in partial payment of the premiums due was authorized. The defense fails, we think, because the evidence is convincing that the president—the sole operating manager of the company—had *apparent* authority to execute the trust agreement, and that plaintiff was justified in inferring that the president had been given authority by the directors to institute a pension plan.[8] As is stated in the Restatement of the Law of Agency § 49 comment b:

"Acts are interpreted in the light of ordinary human experience. If the principal puts one into, or know-

---

5. It appears that these employees received the benefit of life insurance for one year, viz.: from July 15, 1954 to July 15, 1955.

6. Defendant in its amended answer "confesses judgment in favor of the plaintiff in the sum of $5,027.75", which is what remained of the sum received after reimbursing the corporation and the employees for the amount paid on account of premiums. Judgment was not entered in the judgment docket.

7. Act of 1933, P.L. 364, art. III, § 305, 15 Purdon's Pa.Stat.Ann. § 2852–305.

8. Corporations have power to grant pensions in Pennsylvania. Act of May 5, 1933, P.L. 364, art. III, § 316, 15 Purdon's Pa.Stat.Ann. § 2852–316; Act of August 19, 1953, P.L. 1075, § 2, 15 Purdon's Pa.Stat.Ann. § 654.

ingly permits him to occupy, a position in which, according to the ordinary experience and habits of mankind, it is usual for the occupant to have authority of a particular kind, anyone having occasion to deal with one in that position is justified in inferring that the person in question possesses such authority, unless the contrary is then made known."

The Pennsylvania law is in accord. East Girard Savings & Loan Ass'n v. Houlihan, 1953, 373 Pa. 578, 97 A.2d 23.

Muntz himself believed he had that authority, and no one appears to question the fact that he executed the agreement of trust in good faith. He had approved the plan and announced it to several employees on September 9th in plaintiff's presence. After the agreement was executed two payments were made on account of the premiums and reported in the October and November financial statements which were sent to the directors. In November, to plaintiff's knowledge, the general announcement of the inauguration of the pension plan was made to the company employees. On the day the note was delivered, another premium check was given, subsequently paid and reported. To prior apparent authority to execute the agreement, there had been added subsequent apparent affirmance of the pension plan.[9]

The principal argument made on behalf of defendant is that the plaintiff, in order to have protected himself, should have traced Muntz's authority to its source, citing Long v. Lehigh Coal & Navigation Co. of New England, 1928, 292 Pa. 164, 140 A. 871. But the crux of that decision appears to be that something must arise out of the transaction itself to put the party dealing with the agent on inquiry before such party has a duty to inquire fully into the agent's authority. Cf. Maslo Mfg. Corp. v. Proctor Electric Co., 1954, 376 Pa. 553, 103 A.2d 743.

■ In the Long case, the circumstances immediately surrounding the transaction were held to have been sufficient to put the other party on notice that the act which the corporate officer was attempting was not within the scope of his authority. That is certainly not the case here. None of the circumstances surrounding the execution of the note and its delivery to the plaintiff on December 31st were sufficient to put him on notice that Muntz and Comstock did not have authority. The pension plan had been in force for two months; no protest had been made to plaintiff during that period; he had received three substantial partial payments on account of the premiums. The same officers signed the note who had signed the checks in partial payment of the premiums. By that time he could justifiably assume that the pension plan had received corporate sanction and that the note had been authorized. Houghten v. Restland Memorial Park, Inc., 343 Pa. 625, 23 A.2d 497; Little Sawmill Val. Turnpike or Plank-Road Co. v. Federal St. & P. V. Pass. Ry. Co., 194 Pa. 144, 45 A. 66; East Girard Savings & Loan Ass'n v. Houlihan, supra; Trustees of Bryn Mawr College v. Gold Building & Loan Ass'n, 120 Pa.Super. 246, 182 A. 98.

Another problem arises from defendant's request that the court conclude that Exhibits 19 and 20 were materially altered by plaintiff when he wrote the secretary's name on them. However, no argument is made concerning the legal effect of these alterations anywhere in its briefs.

On Exhibit 19 the secretary's signature was written in certification of the resolution; on Exhibit 20 it was written in attestation of the actual signatures of Muntz as president and as trustee. Both documents had been certified under the corporate seal as true and correct copies by Comstock, the assistant secretary. No fraud is charged.

9. Plaintiff in his brief does not rely on the principles of ratification or estoppel to sustain his right to recover on the note.

Exhibit 19 can be immediately eliminated from further consideration since it does not purport to be a contract or other transaction between plaintiff and defendant.

Exhibit 20 is a contract but it is not the contract in litigation. Moreover, an alteration which will discharge a contract must have been made by a party having a right thereunder or a right to compensation for its breach. An alteration made by a third party who is a stranger to the immediate transaction, without the knowledge or consent of the parties thereto, does not effect a discharge.[10] Here the immediate transaction was Exhibit 20—the agreement of trust between defendant by its president and Muntz as trustee. Plaintiff was a stranger thereto, and Muntz expressly denied that he knew of or consented to the adding of the secretary's name in attestation of this agreement. No alteration was made of any contract between defendant company and the Phoenix Mutual Life Insurance Company or between the defendant company and the plaintiff. We think a material alteration of the documents mentioned above is ineffective to deny recovery to plaintiff upon the promissory note which is the subject of the instant action.

### Fee of Expert Witness

The defendant presented a motion to compel plaintiff to reimburse it for a $500 fee paid to a handwriting expert engaged to prove that plaintiff wrote the name "Cyril T. Garvey" on the resolution (Exhibit 19), together with reasonable counsel fees.

The motion avers that in August, 1955, plaintiff in his deposition and in response to an interrogatory swore that he did not write Garvey's name on the resolution. Inspection of the documents reveals the truth of these averments.

At pre-trial conference, in the presence of the expert and under some prompting by the court, it was stipulated that plaintiff wrote the Garvey signature not only on the resolution but also on the trust agreement, although his counsel maintained that plaintiff had no recollection of doing so, and that the fact was of no importance since the exhibits were certified copies. Notwithstanding the stipulation, the expert remained in court two days.

We do not think defendant can be criticized for preparing itself to prove that the plaintiff wrote the Garvey names. Its trial counsel, who is Mr. Garvey, considered it most vital that this fact be incontestably established. But defendant pointed only to Rule 37(c), Fed.Rules Civ.Proc., 28 U.S.C.A., to sustain its demand. That rule, as we understand it, is not applicable to answers made in depositions and to interrogatories under Rules 26 and 33, but only to requests for admissions under Rule 36. Therefore, the motion will be denied.

Judgment will be entered in favor of plaintiff and against the defendant for the sum of $9,000, with interest from December 31, 1954; costs to be divided equally.

An appropriate order will be entered.

10. Restatement of the Law of Contracts § 434, Appeal of Lord, 1945, 351 Pa. 469, 41 A.2d 661; Bowman v. Berkey, 1918, 259 Pa. 327, 103 A. 49; Robertson v. Hay, 1879, 91 Pa. 242.