**Angel L. ORTIZ and Priscilla Ortiz, h/w and The Buck Company, Plaintiffs,**

v.

**DUFF–NORTON COMPANY, INC., and Chester Hoist, Inc., and Lift Tech International, Inc. d/b/a Chester Hoist, Inc., Defendants.**

Civil Action No. 95–CV–5970.

United States District Court, E.D. Pennsylvania.

Aug. 13, 1997.

Robert B. Bodzin, Philadelphia, PA, for Ortiz plaintiffs.

Kirk L. Wolgemuth, Lancaster, PA, for plaintiff The Buck Co.

Richard Hollstein, Philadelphia, PA, for defendant Duff–Norton.

Joseph McHale, Malvern, PA, for defendants Chester Hoist, Inc. and Lift Tech Intern., Inc.

## DECISION AND ORDER

VAN ANTWERPEN, District Judge.

## I. INTRODUCTION

This products liability action arose in diversity originally between Plaintiffs Angel and Priscilla Ortiz and Defendants Duff–Norton, Inc., Chester Hoist, Inc., and Lift Tech International. Plaintiff The Buck Company filed a petition to intervene, and was made a party plaintiff with the full rights of an intervenor by stipulation and agreement of all parties. On April 8, 1997 a settlement conference was convened in our chambers; on April 22, 1997 we entered a standard order marking the case settled, approving the settlement, and retaining jurisdiction for one year for enforcement purposes.

■ At some point thereafter, a dispute arose as to whether a settlement had in fact been entered into. Plaintiffs filed a Petition for Enforcement of Order Approving Settlement Agreement and For Joinder of Buck Company as a Plaintiff on May 13, 1997. It is clear that a court has jurisdiction to enforce a settlement agreement if that court expressly stated in the dismissal order that it retained jurisdiction over the settlement agreement. *Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). As noted, we specifically so retained in our standard order. We therefore held a hearing in open court on June 13, 1997 to consider this matter. Pursuant to Federal Rule of Civil Procedure 52(a), we make the findings of fact as set forth below.

## II. FINDINGS OF FACT

1. Angel L. Ortiz and Priscilla Ortiz, residents of Pennsylvania, originally instituted this products liability action against Duff–Norton Company, Inc., Chester Hoist, Inc.

and Lift Tech International, Inc., all of other states and manufacturers of a hoist and its component parts. Angel Ortiz was severely injured while working as an employee of The Buck Company ("Buck") and using products manufactured by Defendants. Plaintiffs' counsel is Robert B. Bodzin of the law firm of Mesirov Gelman Jaffe Cramer & Jamieson ("Plaintiffs' counsel"). Kirk Wolgemuth, Esq. is counsel for The Buck Company. (Tr., p. 16).[1]

2. At the time of Mr. Ortiz's accident, Buck was a self-insured employer who had a workers' compensation program that was administered by a third-party administrator, CoreSource, Inc. ("CoreSource"). CoreSource has administered the Workers' Compensation claims and conducted hearings for Buck's parent Dixon Valve & Coupling Company, Inc. ("DVCC") and its subsidiaries since 1993. (Tr., p. 38).

3. Prior to the filing of the Complaint, Plaintiffs' counsel was contacted by Victor Warren, Senior Vice President of CoreSource, who requested that Plaintiffs' counsel represent Buck's interest in the subrogation lien, and requesting that they be advised as to the status of the litigation. (Tr. pp. 16, 81).

4. The workers' compensation lien was approximately $470,000.00. (Tr., p. 65).

5. The parties agree and stipulate that CoreSource is the general agent of Buck and CoreSource was authorized to negotiate the workers' compensation liens of Buck and its insurers. (Tr., pp. 11, 12).

6. Buck is a subsidiary of DVCC and is a Pennsylvania corporation. (Tr., p. 36). The Vice President of DVCC, James Canalichio, was the individual with authority to negotiate the workers' compensation lien on behalf of DVCC. He oversees the handling of workers' compensation claims of Buck's employees. (Tr., p. 61). There were four (4) written agreements between CoreSource and DVCC between 1993 and 1997. Plaintiffs' counsel stipulated, for purposes of this matter, that the contracts between Buck and CoreSource required that Buck consent and approve of

---

1. References notated as "Tr." in the findings of fact are to the June 13, 1997 hearing transcript. Also referenced are the numbered exhibits admitted at that hearing.

any settlement involving a subrogation lien. (Tr., p. 13; Buck Exhibits 7, 8, 9). However, plaintiffs' counsel, Buck's counsel Mr. Wolgemuth, and defendants' counsel did not have copies of the contracts between CoreSource and DVCC at any time prior to CoreSource agreeing to compromise the lien on April 22, 1997. (Tr., pp. 12, 19, 104).

7. Throughout the course of this litigation, CoreSource had represented itself to plaintiff and plaintiffs' counsel as being the administrator for Buck's workers' compensation program and "representing" Buck. (Tr., p. 16; Plaintiffs' Exhibit 20).

8. On December 22, 1994, Buck's counsel Mr. Wolgemuth notified Mr. Bodzin that Buck was very interested in following the status of this case because of the extent of its subrogation lien. (Buck Exhibit 4). Plaintiffs' counsel informed Mr. Wolgemuth that they would keep him advised of all developments and provide him with copies of all reports and pleadings. (Buck's Exhibit 5). However, Mr. Wolgemuth noted that this was Buck's first subrogation case, (Tr., p. 113), and that he did not contact Plaintiffs or Defendants for any further updates. (Tr. pp. 96, 97, 111, 115, 116).

9. Prior to this case being placed on the trial list, Mr. Warren represented to Plaintiffs' counsel that he had the authority to monitor the subrogation aspects of this claim. Throughout the course of this litigation, Mr. Warren called plaintiffs' counsel, who provided him with progress reports on the status of the litigation. (Tr., p. 16). At no point were defendants or plaintiffs informed by Buck that either CoreSource or Mr. Warren did not have authority to compromise the subrogation lien. (Tr., pp. 109–111).

10. Mr. Bodzin at one point early in the litigation contacted Buck's counsel Mr. Wolgemuth and asked permission to speak with CoreSource directly. (Tr., p. 106). Permission was given, and Mr. Warren and Core-Source thereafter communicated directly with Mr. Bodzin concerning the subrogation claim and copied Mr. Wolgemuth on the correspondence between Mr. Warren and Mr. Bodzin. (Tr., p. 106; Plaintiffs' Exhibits 12, 14, 26). Neither Mr. Wolgemuth nor anyone from his office ever asked to attend nor did they attend any type of settlement meeting between DVCC and CoreSource. (Tr., p. 55).

11. At some point, plaintiffs' counsel called Mr. Warren and notified him of both the trial date and the fact that a settlement conference might be scheduled. After a settlement conference date was selected, plaintiffs' counsel was contacted by Sandra Girifalco, counsel for Lift Tech, who suggested that the participation of a person with authority to negotiate the workers' compensation lien would be helpful at the settlement conference. Plaintiffs' counsel agreed with this suggestion and advised Ms. Girifalco that he had already contacted Mr. Warren and asked him to participate in the conference. Ms. Girifalco then wrote to this court and requested that a person with authority to compromise the workers' compensation lien be present at the settlement conference. (Tr., p. 17; Plaintiffs' Exhibit 1).

12. On April 4, 1997, this court entered an Order requiring that a person with "full authority" to compromise the workers' compensation lien be present by telephone for the settlement conference. Plaintiffs' counsel then transmitted by facsimile a copy of the order to Mr. Warren. (Tr., pp. 16–19; Plaintiff's Exhibit 2).

13. Neither plaintiffs' nor defense counsel notified Buck's counsel Mr. Wolgemuth that an order had been entered by the Court requiring a person with full authority from CoreSource to attend the settlement conference. (Tr., p. 78). Mr. Wolgemuth did not have any conversations with plaintiff's counsel between the date of that order through early May of 1997 about the proposed Settlement Agreement. (Tr., pp. 13–14).

14. On April 8, 1997, a full-day settlement conference occurred in our chambers. During the course of that settlement conference, Mr. Bodzin spoke to Mr. Warren on several occasions from the court and negotiated the workers' compensation lien with Mr. Warren. Mr. Warren's initial position was that he would not compromise the workers' compensation lien at all. This was consistent with Buck's original representations to Mr. Bodzin. (Tr., pp. 93–94). Mr. Bodzin and Mr.

Warren also discussed the issue of future compensation for medical and indemnity. From the beginning to the negotiations, Mr. Warren said that there would be a continuation of future medical payments without any credits, but he wanted to talk about a compromise of the future indemnity payments. Mr. Bodzin and Mr. Warren arrived at two alternative ways to compromise the lien. One was a compromise of $200,000.00 with all of the medical and indemnity continuing in the future; the second was a compromise of $175,000.00 with all of the medical continuing, but not the indemnity continuing. (Tr., pp. 69–70).

15. Meanwhile, the discussions continued between the parties about how much the defendants would offer to settle the case. The Judge, plaintiffs' and defense counsel and their clients, who were present and waiting outside in the courtroom, were involved. An offer was made whereby plaintiffs would accept the sum of $1,450,000.00 in settlement of all claims subject to a partial waiver of Buck's subrogation lien. (Tr., p. 18). Mr. Bodzin advised the court that he was dissatisfied with the offer and that his clients were looking for more compensation than that. He felt, however, that it was part of his responsibility to sit down and talk to his clients about the offer, because it was a significant amount of money, especially considering the potential liability problems and the wages that Mr. Ortiz had earned prior to the accident. (Tr., p. 71).

16. This court then advised that all parties should discuss the settlement offer further with their clients and inform this court within a week as to whether or not the case had settled. (Tr., p. 71).

17. Mr. Bodzin then met with the plaintiffs for a half-a-day long session, going through the risks and benefits of settlement versus trial. They discussed the impact of the workers' compensation lien, because the compromise of the workers' compensation lien was a significant factor in determining whether or not to accept the settlement.

18. Plaintiffs' counsel did not advise Buck's counsel Mr. Wolgemuth of the settlement discussions that occurred in April of 1997. (Tr., p. 82). Nor did he send a copy of

the April 22, 1997 letter from him to Core-Source with the terms of the proposed settlement. (Tr., p. 79; Plaintiffs' Exhibit 5). Plaintiff's counsel was, however, in constant contact with CoreSource.

19. Mr. Bodzin wrote a letter to counsel for all parties on April 15, 1997 with a copy to the court advising that the plaintiffs agreed to accept the sum of $1,450,000.00. Mr. Bodzin advised in the letter that he was awaiting confirmation from CoreSource that it would honor the proposal made by telephone during the conference with the court the week before. (Plaintiffs' Exhibit 4).

20. Mr. Bodzin then called Mr. Warren three or four times because he was anxious to find out from Mr. Warren if he had clearance from an excess carrier for each of the proposed settlements of the subrogation lien. (Tr., pp. 73, 74).

21. By April 22, 1997, Mr. Warren told Mr. Bodzin that he (Mr. Warren) had the authority to compromise the subrogation lien consistent with either proposal. Mr. Bodzin advised Mr. Warren that plaintiffs had decided to accept the $200,000.00 compromise with continuing medical and indemnity payments. Mr. Bodzin transmitted by facsimile a letter to Mr. Warren on April 22, 1997 with a copy to Mr. and Mrs. Ortiz. In that letter, Mr. Bodzin wrote: "This will confirm that The Buck Company and its workers' compensation insurers have agreed to compromise the workers' compensation lien in the above-captioned matter as follows." Mr. Bodzin enclosed a power of attorney for Mr. Warren to execute for purposes of depositing the settlement check. Mr. Warren returned a signed power of attorney to Mr. Bodzin on April 28, 1997 and advised the $200,000.00 check should be made payable to CoreSource. (Tr., pp. 74–75; Plaintiffs' Exhibits 5, 7).

22. On April 22, 1997, Mr. Warren wrote to Mr. Canalichio and advised that he had resolved the workers' compensation claim for $200,000.00. (Tr., p. 48; Plaintiffs' Exhibit 24).

23. Mr. Warren acted consistent with having authority to compromise the lien from the first moment Mr. Bodzin spoke to him until the day the case was settled. (Tr., p.

76). No one at Buck did anything which would raise a reasonable suspicion by Plaintiffs' or Defendants' counsel that Mr. Warren and CoreSource did not have such authority. (Tr., pp. 105–111).

24. It has been the experience of plaintiffs' counsel and defendants' counsel that it is the custom and practice in litigation that administrators such as CoreSource have final authority to compromise workers' compensation liens. Buck's counsel did not contradict this. At no time did any of the various counsel believe that Buck had any interest in the litigation other than that one of its employees was injured and that a number of its employees were being called as witnesses. Counsel for defendants had numerous conversations between them in which they discussed that the only way the case would settle was if CoreSource compromised the workers' compensation lien. (Tr., pp. 24, 31, 34).

25. Mr. Canalichio did not give Mr. Warren or CoreSource the express authority to waive the subrogation lien. (Tr., pp. 54, 61). Nor did Mr. Canalichio expressly approve of the settlement agreement made between CoreSource, plaintiffs and defendants. (Tr., p. 61). When Mr. Canalichio discovered what Mr. Warren had done, he was upset. (Tr., p. 51).

26. Mr. Warren, though, had corresponded with Mr. Canalichio regarding plaintiffs' claims. In February, 1997, Mr. Canalichio met with Mr. Warren in Detroit and Mr. Warren advised him that the products liability action would go to trial soon. CoreSource provided Mr. Canalichio and DVCC reports of all outstanding claims on a quarterly basis. (Tr., pp. 39–41, 44). Mr. Canalichio did not have any further discussion with Mr. Warren between February and April, 1997. (Tr., p. 51).

27. Two weeks after CoreSource agreed to compromise the lien on behalf of Buck, Buck's counsel Mr. Wolgemuth wrote to plaintiffs' counsel claiming that Mr. Warren and CoreSource did not have the authority to enter into the settlement agreement. (Plaintiffs' Exhibit 8).

28. After the dispute over the settlement arose, Mr. Warren admitted to Buck's counsel Mr. Wolgemuth and Mr. Bodzin that he "screwed up." (Tr., pp. 89, 110).

## III. DISCUSSION

We note first that as a federal court exercising diversity jurisdiction, we are obliged in this case to apply state substantive law. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Greater New York Mutual Insurance Co. v. North River Insurance Co.,* 85 F.3d 1088, 1091 (1996).

▄▄▄ In this case, the Plaintiffs and Defendants are in the unique position of agreeing that a settlement was in fact reached, with the intervenor/plaintiff Buck disagreeing. Of course, "settlement is a judicially favored manner for terminating litigation." *Gross v. Penn Mutual Life Insurance Co.,* 396 F.Supp. 373, 374 (E.D.Pa.1975); *see also Pennwalt Corp. v. Plough, Inc.,* 676 F.2d 77 (3d Cir.1982). Plaintiffs and Defendants argue that Buck is bound by the settlement agreement because Mr. Warren was his general agent and had actual, apparent, and inherent authority to negotiate the lien on behalf of Buck. Buck disagrees. Because we believe that it is clear under Pennsylvania law that Mr. Warren had the inherent authority to bind Buck in this settlement, we will not discuss more than briefly the extent to which he was vested with actual[2] or apparent[3] authority.

---

**2.** Actual authority may either be express or implied. Express authority occurs where there is authority directly and specifically granted by the principal to the agent that binds the principal as to certain matters. *Bolus v. United Penn Bank,* 363 Pa.Super. 247, 525 A.2d 1215, 1221 (1987). Implied authority arises out of express authority; it is the authority to do "those acts of the agent that are necessary, proper and usual in the exercise of the agent's express authority." *Id.* Thus there can be no implied authority without a base

of express authority. There is no evidence that Buck at any time specifically authorized Mr. Warren or CoreSource to negotiate the lien on their behalf; therefore, there can be no implied authority either.

**3.** Apparent authority "results from a manifestation by a person that another is his agent, the manifestation being made [by the principal] to a third person." *Restatement (Second) of Agency*

 "It is a fundamental principle of agency that for a principal to be liable to third parties for the acts of the agent, an agency relationship must first be established." *Restatement (Second) of Agency* § 140 (1957); *SEI Corp. v. Norton & Co.,* 631 F.Supp. 497, 501 (E.D.Pa.1986) (applying Pennsylvania law). We have found, and the evidence bears out, that Plaintiffs and Defendants have met their burden of showing that Mr. Warren and CoreSource are the general agents of Buck. A general agent "is an agent authorized to conduct a series of transactions involving a continuity of service." *Restatement (Second) of Agency* § 3 (1957). To determine whether one is in fact a general agent, we are obliged to look at "the number of acts to be performed in accomplishing an authorized result, the number of people to be dealt with, and the length of time needed to accomplish the result." *Id.* at cmt. a (noting that the hallmark is continuity of service).

CoreSource has been the sole administrator of Buck's workers' compensation program for four years. CoreSource's contract states that it is to act as "advisor and representative of the Employer in all matters pertaining to any and all obligations and requirements of the Employer as imposed by the applicable state workers' compensation law . . . [including making] such investigations as it deems necessary to determine such obligations and negotiating the settlement of and/or effecting the compromise of any claims or suits arising out of such obligations." As a result, it is plain that CoreSource was the general agent of Buck. Moreover, Buck admitted at the hearing on June 13, 1997 that CoreSource is its general agent. (Tr., pp. 11, 12).

 Plaintiffs and Defendants argue that as the general agent for Buck, acting on matters relating to the Pennsylvania workers' compensation laws, CoreSource and Mr. Warren were vested with inherent authority

---

§ 8 cmt. a (1957). It exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized. *Id.* at cmt. c. Pennsylvania law further defines it as "power to bind a principal which the principal has not actually granted but which he [the principal] leads persons with whom his agent deals to believe that he has granted. Persons with whom the agent deals can reasonably believe that the agent has power to bind his principal if, for instance, the principal knowingly permits the agent to exercise such power or if the principal holds the agent out as possessing such power." *Jacobson v. Leonard,* 406 F.Supp. 515, 518 (E.D.Pa.), *aff'd* 546 F.2d 417 (3d Cir.1976); *Refuse Management Systems v. Consolidated Recycling and Transfer Systems,* 448 Pa.Super. 402, 671 A.2d 1140, 1147 (1996); *Revere Press, Inc. v. Blumberg,* 431 Pa. 370, 246 A.2d 407 (1968). However, simply making an individual a general agent is insufficient in Pennsylvania to create apparent authority. *Walker v. Workmen's Compensation Appeal Board,* 656 A.2d 164, 171–172 (Pa.Cmwlth.1995) (Holding that "simply because Jones was an agent of Nationwide does not mean that he had the authority to bind the company for all purposes or that Employer could reasonably infer that he did"). Instead there must be something more, some communication from the principal to the third party, such that it would be reasonable for the third party to infer that the principal consents to have the agent act for him. This can be shown though, by the grant of limited authority to the agent, and conduct of the agent which demonstrates to the third party the agent's apparent authority to bind the principal. *Leidigh v. Reading Plaza General, Inc.,* 431 Pa.Super. 310, 636 A.2d 666, 667–668 (1994); *Turner*

*Hydraulics v. Susquehanna Const.,* 414 Pa.Super. 130, 606 A.2d 532, 534 (1992).

In the case at hand, Mr. Warren, as the Senior Vice President of CoreSource, was a general agent of Buck. However, the evidence is questionable as to whether Buck knowingly permitted CoreSource to exercise authority or held them out as possessing it. *See Duquesne Truck Service v. Workmen's Compensation Appeal Board,* 165 Pa.Cmwlth. 145, 644 A.2d 271 (1994). While the agreements between CoreSource and Buck requiring Buck's prior approval on final disposition of litigation were not known to any of the parties at the time of the settlement, there was little direct communication between Buck and the Plaintiffs and Defendants. Plaintiffs have pointed out that Buck was copied on some correspondence between Plaintiffs' counsel and CoreSource. However, this merely indicates a failure by Buck to anticipate and correct a misunderstanding on the part of Plaintiffs, not an affirmative manifestation of assent to agent authority. Certainly, though, it seems that Buck gave CoreSource at least a limited authority to negotiate settlements on it's behalf by virtue of naming them general agent, and Mr. Warren, as agent, communicated several times to the Plaintiffs that he was authorized to act on Buck's behalf in this matter. In addition, based on regular business practices in this area, it appears reasonable that the third parties would believe that he was in fact authorized. This seems to satisfy the test under *Turner,* 414 Pa.Super. 130, 606 A.2d 532. Regardless, because of our determination that Mr. Warren and CoreSource had inherent authority, we need go no further in determining this issue.

to act on Buck's behalf. Inherent authority is defined in the Restatement (Second) of Agency as "a term used . . . to indicate the power of an agent which is derived not from authority, apparent authority or estoppel, but solely from the agency relation and exists for the protection of persons harmed by or dealing with a servant or other agent." *Restatement (Second) of Agency* § 8A (1957). Section 161 defines inherent authority further in the discussion of the unauthorized acts of a general agent: "a general agent for a disclosed . . . principal subjects his principal to liability for acts done on his account which usually accompany or are incidental to transactions which the agent is authorized to conduct if, although they are forbidden by the principal, the other party reasonably believes that the agent is authorized to do them and has no notice that he is not so authorized." *Restatement (Second) of Agency* § 161 (1957).

Thus, a general agent may have authorization to do certain things which would normally accompany his position simply by virtue of being given the position by the principal; the principal's liability exists solely because of his relation to the agent. The reasoning behind this type of authority involves the understanding that "commercial convenience requires that the principal should not escape liability where there have been deviations from the usually granted authority by persons who are such essential parts of his business enterprise." *Restatement (Second) of Agency* § 161 cmt. a. Where both the principal and the third party are equally innocent, and there has been a complete breakdown of communication between the principal and the third party, the liability is best placed on the party with the most control over the agent, i.e. the principal. *See Lincoln Bank v. National Life Ins. Co.,* 476 F.Supp. 1118, 1123 (E.D.Pa.1979). Moreover, because the principal enjoys the benefits of employing an agent, it is only fair that the principal bear the burden of supervision. *See Restatement (Second) of Agency* § 161 cmt. a.

Of course, if the third party has notice of the limitations on the agent's authority, the principal does not become liable for the transaction. A person has notice of a fact only if he consciously knows the fact, has reason to know it because of information made available to him, should know it, or has been given notification of it. *Restatement (Second) of Agency* § 9 (1957).

In the case at hand, it is clear that CoreSource and Mr. Warren had inherent authority to bind Buck. CoreSource was the general agent of Buck, in charge of handling matters relating to workers' compensation, and the third party administrator of its various health and benefit plans. There was evidence that the usual practice in suits by injured parties for injuries incurred at the workplace is to involve the individual capable of compromising the workers' compensation lien at any settlement conference. It is in fact a pivotal part of any such settlement. It is also very much the usual business practice that the person so involved is a representative of the administrator of the program, be the employer self-insured or not. As such, from very early on in the litigation, CoreSource contacted the Plaintiffs' counsel, and remained in full contact throughout. As settlement became a possibility, both Plaintiffs and Defendants recognized the need to have the agent available for negotiations on the lien. As such, they requested from this court that Mr. Warren be made available by telephone, and we concurred.

Buck's argument that its attorney had told Plaintiffs' counsel that Buck would not compromise the lien is not to the contrary, because the comment was made "in a joking manner" and because the evidence shows that the agent, too, began negotiations by stating that they would not compromise the lien. As waiving or compromising the lien to obtain a settlement is involved in every such settlement negotiations, the fact that Mr. Warren eventually agreed to compromise the lien is not inconsistent with Plaintiffs' and Defendants' understanding of the norm. Moreover, the fact that Buck was represented by counsel did not comprise notice that its general agent now had less authority to act; it is merely indicative that Buck had several agents looking after its various interests.

Indeed, there was nothing in CoreSource's or Buck's actions that would have reasonably

put Plaintiffs or Defendants on notice that CoreSource was not authorized to compromise the lien without Buck's consent. Rather, CoreSource consistently and repeatedly informed Plaintiffs and Defendants that it had full authority to negotiate the lien and Buck did nothing to create doubt as to that authority. By appointing CoreSource to be its general agent, Buck vested it with the inherent authority to conduct specifically this type of negotiations on its behalf.

Buck's main argument in opposition to a finding of inherent authority is that Pennsylvania has not in fact adopted inherent authority as contained in Sections 8A or 161 of the Restatement (Second) of Agency. However, a detailed examination of the caselaw in this area shows Buck to be in error. A number of district courts within the Eastern District of Pennsylvania have discussed the issue. In *Lincoln Bank*, the Court referenced "the policy judgment expressed by the Pennsylvania courts in adopting the doctrine of 'inherent agency authority,' " the Restatement (Second) of Agency § 161, and stated that "[t]his court believes that, were the issue squarely before it, The Supreme Court of Pennsylvania would expressly adopt section 161." *Lincoln Bank*, 476 F.Supp. at 1118.

In another case, the court said that "Section 161 is clearly the law in Pennsylvania." *Ebasco Services v. Pennsylvania Power and Light Co.* *("Ebasco I")*, 402 F.Supp. 421, 446 n. 41 (E.D.Pa.1975) (Becker, J.), *citing Rednor & Kline, Inc. v. Department of Highways*, 413 Pa. 119, 196 A.2d 355, 358 (1964); *Diuguid v. Bethel African Methodist Church*, 119 Pa.Super. 493, 180 A. 737, 738 (1935); *Anthony P. Miller, Inc. v. Needham*, 122 F.2d 710, 712–13 (3d Cir.1941); *Waldron v. Aetna Cas. & Sur. Co.*, 141 F.2d 230, 234–235 (3d Cir.1944). Three years later, that same court reaffirmed this decision. *Ebasco Services v. Pennsylvania Power and Light Co.* *("Ebasco II")*, 460 F.Supp. 163, 203 n. 48 (E.D.Pa.1978) (Becker, J.) ("We reaffirm our reliance in this regard on *Diuguid v. Bethel A.M.E. Church*"). *See also Blair v. J.R. Andrews, Inc.*, 141 F.Supp. 51, 55–56 (E.D.Pa.1956) (referencing inherent authority, and stating "[t]he Pennsylvania law is in accord"), *citing East Girard Savings & Loan*

*Ass'n v. Houlihan*, 373 Pa. 578, 97 A.2d 23 (1953); *Tiernan v. Devoe*, 923 F.2d 1024, 1036 n. 9 (3d Cir.1991) (citing *Rednor & Kline* as Pennsylvania's version of inherent authority and the *Restatement (Second) of Agency* § 8A).

An examination of the cases cited reveals why we are led to agree with these courts. While originally authority for agents was recognized only as either actual and apparent, Pennsylvania courts (as all others) began to recognize a sort of apparent authority derived from the mere fact of one's position with the principal. In *Osborne v. Victor Dairies*, the court stated that:

that an active president is presumed to have sufficient authority [from the company] to handle ordinary or routine business transactions such as buying materials, selling the product of the corporation, or placing insurance is too well settled to require discussion.... One who knows that the officer or agent of a corporation habitually transacts certain kinds of business for such corporation under circumstances which necessarily show knowledge on the part of those charged with the conduct of the corporate business assumes, as he has a right to assume, that such agent is acting within the scope of his authority.

*Osborne v. Victor Dairies*, 138 Pa.Super. 117, 10 A.2d 129, 132 (1939); *See also Bangor & P. Ry. Co. v. American Bangor Slate Co.*, 203 Pa. 6, 52 A. 40 (1902) (referencing "incidental or inherent authority" but stating that the individual did not have it because the actions complained of were not the usual functions of that officer).

In *East Girard*, the court stated that the agent had apparent authority because, "in our opinion, Houlihan was perfectly justified in inferring that Idler's authority, as manager, included the ordinary power of dealing with the Association's collateral." *East Girard*, 97 A.2d at 24. Then, in *Rednor & Kline*, the Supreme Court of Pennsylvania recognized that the Restatement (Second) of Agency had a different name for the type of agency where authority is apparent solely from the position, stating that the authority of an officer to act on behalf of the principal would be "sustained on the ground of his

implied, or as the Restatement (Agency Second, section 8A) calls it 'inherent' . . . authority." *Rednor & Kline,* 196 A.2d at 358. In this way, the Supreme Court of Pennsylvania recognized that the only difference between the inherent authority as outlined in Section 161 of the Restatement (Second) of Agency and the equitable authority they had enforced for years based on one's position with the principal was a matter of names and semantics.

Therefore, recently, in *Rothman v. Fillette,* the Court noted a situation where express and apparent authority did not apply, and stated that "under these circumstances, we believe applicable here the long recognized principle that where one of two innocent persons must suffer because of the fraud of a third, the one who has accredited him must bear the loss." *Rothman,* 503 Pa. 259, 469 A.2d 543, 545 (1983). The Court went on to note that Pennsylvania case law supports the idea that "the fact that the agent has wronged his principal through the agent's unlawful act does not provide a predicate for insulating the principal against the harm caused by the agent at the expense of the innocent third party who had no responsibility for the conduct of the agent." *Id.,* 469 A.2d at 546, *citing Keller v. N.J. Fidelity and Plate Glass Insurance Co.,* 306 Pa. 124, 159 A. 40 (1932); *Williams v. Cook,* 289 Pa. 207, 137 A. 232 (1927); and *Rykaczewski v. Kerry Homes,* 192 Pa.Super. 461, 161 A.2d 924, 926 (1960).

It is consequently very clear that Pennsylvania has adopted the law contained in the Restatement (Second) of Agency §§ 8A and 161. As such, and because of the discussion above, CoreSource and Mr. Warren were vested with the inherent authority to compromise the lien and make the settlement in this case. We note without deciding that Buck is not left without a remedy, as it may no doubt seek remuneration from Core-Source. Because we find no bad faith, vexatious reasoning, or actions without justification on the part of Buck, we decline to award attorneys' fees and costs.

## IV. CONCLUSIONS OF LAW

Consistent with the foregoing findings of fact and discussion, we state the following conclusions of law pursuant to Fed.R.Civ.P. 52(a):

1. CoreSource and Mr. Warren were the general agent of Buck.

2. CoreSource and Mr. Warren had the inherent authority to act on Buck's behalf in negotiating the workers' compensation lien in settlement talks between Plaintiffs and Defendants.

3. Buck is bound by the April 22, 1997 lien compromise and settlement agreed to by its agents CoreSource and Mr. Warren.

4. Plaintiffs Angel and Priscilla Ortiz and Defendants are entitled to have the lien compromise and overall settlement as approved by us on April 22, 1997 enforced.

5. There has been no showing of bad faith, vexatious reasoning, or actions without justification. Attorneys' fees and costs will therefore not be awarded in this case.

An appropriate order follows.

### *ORDER*

AND NOW, this 13th day of August, 1997, in consideration of the evidence presented at a hearing in open court on June 13, 1997; Plaintiffs' Petition for Enforcement of Order Approving Settlement Agreement and For Joinder of Buck Company as a Plaintiff filed May 13, 1997; Plaintiff The Buck Company's response thereto filed June 5, 1997; Plaintiffs Ortiz's Proposed Findings of Fact and Brief filed July 1, 1997, as joined by Defendants Chester Hoist and Lift Tech International on July 14, 1997; Plaintiff The Buck Company's Proposed Findings of Fact and Brief filed July 16, 1997; Plaintiff Ortiz's Response thereto filed July 18, 1997; and Defendant Duff–Norton Company's Proposed Findings of Fact and Brief filed July 23, 1997, and consistent with the foregoing opinion, the court hereby ORDERS and FINDS as follows:

1. Plaintiffs' Petition for Enforcement of Order Approving Settlement Agreement and For Joinder of Buck Company as a Plaintiff filed May 13, 1997 is GRANTED.

2. The Court finds that an enforceable settlement agreement in the amount of

$1,450,000.00 exists between Plaintiffs Angel and Priscilla Ortiz, and Defendants Duff–Norton Company, Chester Hoist, Inc, and Lift Tech International, Inc d/b/a Chester Hoist, Inc..

3. The Court finds that an enforceable agreement exists between the plaintiffs Angel and Priscilla Ortiz and The Buck Company with the following terms: as set forth in Plaintiffs' Exhibit 7, Mr. and Mrs. Ortiz will pay the sum of $200,000.00 in full settlement of all subrogation claims of the Buck Company and/or its workers' compensation insurers. Mr. Ortiz will continue to receive all medical and indemnity payments in the future without any future deductions or credits for sums recovered in this action.

4. Plaintiffs Ortiz's Motion for Attorney's fees and costs is DENIED.

5. This case is CLOSED for administrative purposes, however this court will continue to retain jurisdiction for enforcement purposes.